

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ENTERED**
**08/05/2009**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Case No. 03-45813-H4-13** |
| **JAVIER PENA and SANDRA PENA** | § | |
| | § | **Chapter 13** |
| Debtors. | § | |
| | § | |
| **JAVIER PENA and SANDRA PENA ,** | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | **Adversary No. 08-03324** |
| | § | |
| **WELLS FARGO BANK, N.A., and** | § | |
| **WASHINGTON MUTUAL BANK, F.A.,** | § | |
| **as part of JPMORGAN CHASE BANK,** | § | |
| **N.A.** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION REGARDING DEFENDANT JPMORGAN CHASE BANK'S 12(b)(6) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM
[Docket No. 29]

### I. INTRODUCTION

The debtors in the above-referenced Chapter 13 case have filed a lawsuit based upon alleged improper servicing of their loan by Wells Fargo Bank, N.A. (Wells Fargo) and Washington Mutual Bank, F.A. (WaMu). Because all of WaMu's assets have been transferred to JPMorgan Chase Bank, N.A. (JPMorgan Chase) pursuant to a purchase and assumption agreement between JPMorgan Chase and the FDIC (as receiver for WaMu), the debtors have joined JPMorgan Chase as a defendant in this lawsuit.

JPMorgan Chase has filed a motion to dismiss the debtors' claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6) (12(b)(6)) on the grounds that it expressly did not assume

any liability for "borrower claims" against WaMu.  Alternatively, JPMorgan Chase contends that WaMu's servicing obligations with respect to the debtors' loan was transferred to Wells Fargo before JPMorgan Chase purchased WaMu's assets from the FDIC such that the debtors have no viable claims against JPMorgan Chase.

For the reasons set forth below, this Court concludes that JPMorgan Chase's motion to dismiss should be denied.

## II. FINDINGS OF FACT

**The Penas' Bankruptcy Case**

1.  On November 3, 2003, Javier Pena and Sandra Pena (collectively, the Penas or the Debtors) jointly filed a voluntary Chapter 13 petition, initiating the above-referenced Chapter 13 case. [Case No. 03-45813; Docket No. 1.]

2.  On May 12, 2004, the Debtors filed an Amended Chapter 13 Plan.   [Case No. 03-45813; Docket No. 17.] The plan provides, inter alia, that "[a]ll property of the Debtor's Estate shall vest in the Debtor . . . upon Debtor receiving a discharge under 11 U.S.C. § 1328 or Debtor's case being dismissed." [Case No. 03-45813; Docket No. 17, ¶ T.]

3.  On September 28, 2004, this Court issued an order confirming the Debtors' Amended Chapter 13 Plan.  [Case No. 03-45813; Docket No. 37.]

4.  On March 2, 2005, WaMu filed a Motion for Relief from the Automatic Stay alleging that the Debtors had not been making timely payments pursuant to their note and deed of trust with WaMu.  [Case No. 03-45813; Docket No. 43.]

5.  On March 22, 2005, this Court issued an Order Conditioning the Automatic Stay as to WaMu which set forth that the automatic stay would remain in effect so long as the Debtors

remained current on their monthly mortgage payments to WaMu and so long as the Debtors modified their plan to provide for the curing of $4,326.46 in post-petition arrearages then owed to WaMu. [Case No. 03-45813; Docket No. 46.]

6. On July 11, 2006, WaMu filed a Certificate of Default alleging that the Debtors had defaulted on their mortgage obligations in violation of this Court's Order Conditioning the Automatic Stay. [Case No. 03-45813; Docket No. 57.]

7. On January 17, 2007 the Debtors filed a Motion to Set Aside Notice and Termination of the Automatic Stay and Request for Hearing, alleging that the Debtors had made their mortgage payments on a timely basis and requesting that the automatic stay remain in effect with respect to WaMu. [Case No. 03-45813; Docket No. 58.] Subsequently, on February 26, 2007, the Debtors supplemented this motion to explain that "in late 2006 or early 2007, [the Debtors' loan with WaMu] was sold or transferred to another lender" and alleging that despite the fact that the Debtors had been making timely mortgage payments, they continuously received notices of termination of the automatic stay. [Case No. 03-45813; Docket No. 66.]

8. On February 27, 2007, this Court held a hearing on the Debtors' Motion to Set Aside Notice and Termination of the Automatic Stay. This Court admitted exhibits offered by both parties into evidence and heard testimony from the Debtors and Richard Aurich, counsel for the Chapter 13 Trustee. At the conclusion of this hearing, this Court recited oral findings of fact and conclusions of law into the record and granted the Debtors' Motion to Set Aside Notice and Termination of the Automatic Stay.

9. On March 8, 2007, this Court issued a written order memorializing its oral ruling on the

Debtors' Motion to Set Aside Notice and Termination of the Automatic Stay (the Order). [Case No. 03-45813; Docket No. 68.]   The Order set forth, inter alia, that WaMu and Wells Fargo would pay for a comprehensive independent accounting of the Penas' loan from the inception of the loan through the date of the Order.   The Court subsequently amended the Order on May 1, 2007 to change the amount of the Debtors' attorney's fees that WaMu and Wells Fargo were required to pay and to require that the comprehensive accounting described above be filed with the Court on or before June 29, 2007.   [Case No. 03-45813; Docket No. 79.]

10.   On April 8, 2007, Wells Fargo filed a "Notice of Transfer of Servicing," which sets forth that "the servicing of the mortgage loan represented by the Proof of Claim #1 filed on 12/8/2003 in the amount of $11,505.54 by Washington Mutual Bank . . . has been transferred to Wells Fargo Bank, N.A."  [Case No. 03-45813; Docket No. 72.]

11.   On July 9, 2007, a comprehensive accounting of the Penas' loan prepared by Marie McDonnell, a mortgage fraud and forensic analyst for Truth in Lending Audit & Recovery Services, LLC, was filed with this Court (the Audit).   [Case No. 03-45813; Docket No. 88.] The Audit reveals, among other things, that WaMu transferred the Penas' loan to Wells Fargo and that, during the period beginning on December 1, 2006 and ending on June 27, 2007, "Wells Fargo continued to service the Penas' loan in lock step with [WaMu], that is to say, in a perpetual state of default because it failed to recalibrate the loan according to the Bankruptcy Rules and to properly establish the Trustee's suspense account."  [Case No. 03-45813; Docket No. 88, p. 10.]

12.   On February 10, 2009, the Chapter 13 Trustee filed a notice of plan completion, [Case No.

4

03-45813; Docket No. 106], and on February 11, 2009, this Court issued an order granting the Debtors a discharge.   [Case No. 03-45813; Docket No. 107.]

**The Adversary Proceeding**

13.    On September 3, 2008, the Debtors filed a Complaint for Damages Against Wells Fargo, initiating the above-referenced adversary proceeding. [Adv. Docket No. 1.] In their original complaint, the Debtors brought causes of action solely against Wells Fargo largely based on allegations of improper servicing of the Penas' loan.

14.    On April 21, 2009, the Debtors, after obtaining leave of the Court, filed a Second Amended Complaint (the Complaint), which added WaMu, "as part of JPMorgan Chase," as a defendant in this adversary proceeding. [Adv. Docket No. 17.] The Complaint alleges the following causes of action against Wells Fargo and WaMu, as part of JPMorgan Chase: (1) violations of the automatic stay; (2) violations of the Texas Debt Collection Act; (3) violations of the Texas Deceptive Trade Practices Act; (4) violations of the Federal Fair Debt Collection Practices Act; (5) breach of contract; (6) negligence; (7) fraud/intentional misrepresentation; (8) intentional infliction of emotional distress; (9) wrongful notice of default; (10) violations of the Real Estate Settlement Procedures Act; (11) breach of fiduciary duty/defalcation; (12) breach of the duty of good faith and fair dealing; (13) unjust enrichment; (14) an objection to Wells Fargo's proof of claim; (15) violations of the loss mitigation provisions of the National Housing Act; and (16) a request for declaratory and injunctive relief.

15.    On June 1, 2009, JPMorgan Chase filed a 12(b)(6) Motion to Dismiss for Failure to State a Claim (the Motion to Dismiss). [Adv. Docket No. 29.] The Motion to Dismiss contends that

5

the Debtors' "allegation that [WaMu] is 'part of [JPMorgan Chase]' is an incorrect statement." JPMorgan Chase argues that WaMu is part of the Federal Deposit Insurance Corporation (the FDIC), and that JPMorgan Chase only purchased certain assets from the FDIC while expressly disclaiming any liability with respect to those assets. JPMorgan Chase thus contends that the FDIC, not JPMorgan Chase, is the proper party to be sued with respect to any claims for WaMu's improper servicing of the Penas' loan. JPMorgan Chase requests that all causes of action brought by the Debtors against JPMorgan Chase should be dismissed. JPMorgan Chase has also filed a brief in support of the Motion to Dismiss. [Adv. Docket No. 30.]

16.     On June 22, 2009, the Debtors filed a response to the Motion to Dismiss in which they assert that JPMorgan Chase purchased the Penas' loan from the FDIC and expressly assumed all servicing "rights and obligations." [Adv. Docket No. 34.] As a result, the Debtors argue that the Motion to Dismiss should be denied, or, in the alternative, that the Debtors should be permitted to join the FDIC as a party to this lawsuit in addition to, or instead of, JPMorgan Chase.

17.     On July 23, 2009, this Court held a hearing on the Motion to Dismiss. At this hearing, counsel for the Debtors represented that before the actions giving rise to this lawsuit occurred, WaMu owned the Penas' loan and subsequently transferred it to Countrywide Home Loans, Inc. (Countrywide). Contemporaneously with this transfer, WaMu entered into a agreement with Countrywide whereby WaMu would continue to service the Penas' loan. The Debtors contend that the actions giving rise to this lawsuit occurred while WaMu—and subsequently Wells Fargo—serviced the Penas' loan and that the Debtors' complaint

involves WaMu and Wells Fargo's allegedly improper servicing of their loan.  Counsel for

the Debtors argued that because the FDIC became receiver for WaMu and thereafter

transferred all of WaMu's assets and liabilities to JPMorgan Chase, JPMorgan Chase is a

proper party to this lawsuit.[1]  Counsel for JPMorgan Chase offered into evidence a Purchase

and Assumption Agreement executed by the FDIC and JPMorgan Chase on September 25,

---

[1] The Eleventh Circuit has provided a fine summary of this sort of FDIC purchase and assumption transaction and the policies governing the FDIC's receivership arrangements in *Gunter v. Hutcheson*:

> The Federal Deposit Insurance Corporation is a federal agency which insures bank deposits. As insuror one of the primary duties of the FDIC is to pay the depositors of a failed bank. The FDIC has two methods of accomplishing this duty. The simplest method is to liquidate the assets of the bank and then pay the depositors their insured amounts, covering any shortfall with insurance funds. This option, however, has two major disadvantages. First, the sight of a closed bank, even an insured one, does not promote the utmost confidence in the banking system. Accounts are frozen, checks are returned unpaid, and a significant disruption of the intricate financial machinery results. Second, depositors may wait months to recover even the insured portion of their funds, and uninsured funds may be irrevocably lost.

> To avoid the significant problems with liquidation, the FDIC whenever feasible employs a "purchase and assumption" transaction in which the Corporation attempts to arrange for another bank to "purchase" the failed bank and reopen it without interrupting banking operations and with no loss to the depositors. A purchase and assumption involves three entities: the receiver of the failed bank, the purchasing bank, and the FDIC as insuror. In most cases, the FDIC is appointed receiver by the appropriate banking authority and thus acts in two separate capacities: as receiver and as corporate insuror.

> As soon as the receiver is appointed, the FDIC solicits bids from other banks for the purchase of the failed bank and assumption of its liabilities. The bids represent the "going concern" value of the failed bank. After receiving the bids, the FDIC Board of Directors determines whether the purchase and assumption is feasible according to the statutory requirements of 12 U.S.C. s 1823(e). If a bid is accepted, the purchasing bank agrees with the receiver to buy the assets and assume the liabilities of the failed bank.

> While the purchase of a failed bank is an attractive way for other banks to expand their operations, a purchase and assumption must be consummated with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services. Because the time constraints often prohibit a purchasing bank from fully evaluating its risks, as well as to make a purchase and assumption an attractive business deal, the purchase and assumption agreement provides that the purchasing bank need purchase only those assets which are of the highest banking quality. Those assets not of the highest quality are returned to the receiver, resulting in the assumed liabilities exceeding the purchased assets. To equalize the difference, the FDIC as insuror purchases the returned assets from the receiver which in turn transfers the FDIC payments to the purchasing bank. The FDIC then attempts to collect on the returned assets to minimize the loss to the insurance fund. In an appropriate case, therefore, the purchase and assumption benefits all parties. The FDIC minimizes its loss, the purchasing bank receives a new investment and expansion opportunity at low risk, and the depositors of the failed bank are protected from the vagaries of the closing and liquidation procedure.

674 F.2d 862, 865 (11th Cir. 1982), *overruled on other grounds by Langley v. FDIC*, 484 U.S. 86 (1987).

2008 (the P&A Agreement), which this Court admitted without objection. The P&A Agreement transfers all of the assets and obligations of WaMu (therein defined as the "Failed Bank") to JPMorgan Chase subject to certain terms and conditions. Section 2.5 of the P&A Agreement provides that one of the conditions of the transfer was that any liability for "Borrower Claims" (a term which is not defined in the P&A Agreement) would not be assumed by JPMorgan Chase. Counsel for JPMorgan Chase argued that this provision of the P&A Agreement conclusively establishes that JPMorgan Chase is not a proper party to this lawsuit. Alternatively, counsel for JPMorgan Chase asked this Court to take judicial notice of the Audit, which, she contended, establishes that Wells Fargo assumed all rights and obligations with respect to servicing the Penas' loan in December of 2006. In either case, she asserted that JPMorgan is not a proper party to this lawsuit and that the Motion to Dismiss should be granted. Counsel for the Debtors responded that sections 2.1 and 3.1 of the P&A Agreement expressly state that JPMorgan assumed "all mortgage servicing rights and obligations of [WaMu]." He also argued that the Motion to Dismiss should be denied because the Audit is unclear as to whether all of WaMu's servicing rights and obligations with respect to the Penas' loan were transferred to Wells Fargo.

### III. CONCLUSIONS OF LAW

**A.     Jurisdiction and Venue**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B),

(O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2).[2] *See In re Southmark Corp.*, 163

F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive

right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of

a bankruptcy case."); *In re Ginther Trusts*, No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D.

Tex. Dec. 22, 2006) (holding that an "Adversary Proceeding is a core proceeding under 28 U.S.C.

§ 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically

name this particular circumstance").  Venue is proper pursuant to 28 U.S.C. § 1409.

## B.      12(b)(6) Standard

When ruling on a motion to dismiss for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6), "courts generally may rely only on the complaint and its proper attachments."

*Fin. Acquisition Partners v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006).  The Court is also

permitted to rely on matters of public record when making its ruling on a motion to dismiss pursuant

to Rule 12(b)(6).  *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995).  "Motions to dismiss are

viewed with disfavor and are rarely granted." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559,

---

[2]  Because the Debtors have filed a lawsuit alleging that the defendants improperly serviced the Debtors' mortgage account in violation of the automatic stay, this Court has jurisdiction over this lawsuit even though the Debtors have received a discharge.

The Fifth Circuit has recognized that a bankruptcy court retains subject matter jurisdiction post-discharge to ensure that the rights afforded to a debtor under the Bankruptcy Code are fully vindicated. *See, e.g.*, *In re Bradley*, 989 F.2d 802, 804-05 (5th Cir. 1993) (holding that the bankruptcy court properly exercised subject matter jurisdiction to hear plaintiffs' post-discharge employment discrimination claims arising under 11 U.S.C. § 525). The Fifth Circuit has also explained that the bankruptcy courts retain jurisdiction post-closure to ensure compliance with its plan confirmation order. *See, e.g.*, *In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390 (5th Cir. 2001) (holding that bankruptcy courts retain subject matter jurisdiction over a discharged debtor with respect to "matters pertaining to the implementation of the plan"). And it expressly held in *In re National Gypsum Co.* that "a declaratory judgment action seeking merely a declaration that collection of an asserted preconfirmation liability is barred by a bankruptcy court's confirmation of a debtor's reorganization plan . . . is a core proceeding arising under title 11." *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056, 1064 (5th Cir. 1997).  Additionally, in *Wilborn*, this Court expressly held that it "has subject matter jurisdiction post-closure to remedy violations of a debtor's bankruptcy rights that occurred before the bankruptcy case was closed," and "to enforce its own orders, including its orders confirming Chapter 13 plans." *Wilborn v. Wells Fargo Bank, N.A. (In re Wilborn)*, 401 B.R. 872, 890 (Bankr. S.D. Tex. 2009).

Thus, this Court has jurisdiction over this lawsuit, which was brought by the Debtors before the entry of the discharge order and which involves allegations that the defendants violated the automatic stay and improperly assessed fees and charges to the Debtors' mortgage account during the pendency of the Debtors' Chapter 13 case.

570 (5th Cir. 2005) (quoting *Shipp v. McMahon*, 199 F.3d 256, 260 (5th Cir. 2000)). Thus, "all well-pleaded facts must be viewed in the light most favorable to the plaintiff" and the Motion to Dismiss "should be granted only if it is evident the plaintiff cannot prove any set of facts entitling them to relief." *Fin. Acquisition Partners*, 440 F.3d at 286.

The Court must deny a 12(b)(6) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Rankin v. Wichita Falls*, 762 F.2d 444, 446 (5th Cir. 1985) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). A 12(b)(6) motion to dismiss for failure to state a claim "tests only the formal sufficiency of the statements of the claims for relief. It is not a procedure for resolving contests about the facts or the merits of the case." *Jolly v. Klein*, 923 F. Supp. 931, 942 (S.D. Tex. 1996). Accordingly, the Court may not look beyond the plaintiff's pleadings when ruling on a motion to dismiss pursuant to 12(b)(6). *McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992); *see also Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) ("The task of the court in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, [and] not to assay the weight of the evidence which might be offered in support thereof.'" (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir. 1984))). If the court looks outside the four corners of the complaint and considers evidence, "the Rule 12(b)(6) motion may be converted into a motion for summary judgment and disposed of under Federal Rule of Civil Procedure 56." *Haddy v. United States*, 2008 U.S. Dist. LEXIS 77230, at *5-6 (W.D. Tex. Feb. 29, 2008).

Here, JPMorgan Chase relies largely on an exhibit admitted at the hearing on the Motion to Dismiss—i.e. the P&A Agreement—to support its position that it is not a proper party to this lawsuit. Because this Court must look outside the four corners of the complaint and consider exhibits in order to make a ruling on the Motion to Dismiss, the motion is more properly treated as

motion for summary judgment under Federal Rule of Civil Procedure 56.

**C.    Summary Judgment Standard**

"Summary judgment is appropriate under Fed. R. Civ. P. 56 if the record discloses that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1286 (5th Cir. 1990) (internal marks and citations omitted). "The pleadings, depositions, admissions, and answers to interrogatories, together with affidavits, must demonstrate that no genuine issue of material fact remains." *Id.* (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 322-23 (1986)). To that end, this Court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Id.* (quoting *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986)). "Where the record taken as [a] whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

The Debtors' claims in the suit at bar stem from the allegedly improper servicing of the Penas' loan by WaMu and Wells Fargo. Essentially, JPMorgan Chase contends that it is not a proper party to this lawsuit because the P&A Agreement—which transferred all of WaMu's assets and obligations to JPMorgan Chase—expressly states that JPMorgan Chase will not be liable for any "borrower claims." Specifically, section 2.5 of the P&A Agreement contains the following language:

> **Borrower Claims.** Notwithstanding anything to the contrary in this Agreement, <u>any liability associated with borrower claims </u>for payment of or liability to any borrower for monetary relief, or that provide for any other form of relief to any borrower, whether or not such liability is reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, legal or equitable, judicial or extra-judicial, secured or unsecured, whether asserted affirmatively or defensively, <u>related in any way to any loan or commitment to lend </u>made by [WaMu] prior to failure, or to any loan made by a third party in connection with a loan which is or was held by [WaMu], <u>or otherwise arising in connection with [WaMu's] lending or loan purchase activities are specifically not assumed by [JPMorgan Chase]</u>.

[JPMorgan Chase's Exhibit 1] (emphasis added).  Alternatively, JPMorgan Chase argues that because the Audit indicates that WaMu's servicing rights and obligations were transferred to Wells Fargo in December of 2006, all liability concerning the servicing of the Penas' loan belongs to Wells Fargo, and was therefore not transferred to JPMorgan Chase under the P&A Agreement.  In either case, JPMorgan Chase contends that the Debtors have no cognizable claims against it and that the Motion to Dismiss should therefore be granted.

The Debtors respond that they have not brought "borrower claims" against JPMorgan Chase; but rather, that they have sued JPMorgan Chase in its capacity as assignee of WaMu's servicing rights and obligations with respect to the Penas' loan.  The Debtors contend that the P&A Agreement distinguishes between "borrower claims" and claims based on WaMu's servicing obligations, which JPMorgan Chase has expressly assumed.  Specifically, the Debtors point to language from sections 2.1 and 3.1 of the P&A Agreement, which provide that JPMorgan Chase "specifically assumes all mortgage servicing rights *and obligations* of [WaMu]" (emphasis added).[3]  Alternatively, the Debtors urge this Court to disregard JPMorgan Chase's argument that WaMu's servicing obligations were transferred to Wells Fargo before the P&A Agreement was executed because there is uncertainty as to whether WaMu's servicing contract with Countrywide was, in fact, transferred to Wells Fargo.   The Court will first address JPMorgan Chase's alternative argument—that WaMu's servicing liabilities with respect to the Penas' loan were transferred to Wells Fargo and were thus

---

[3]  Section 2.1 of the P&A Agreement, entitled "**Liabilities Assumed by Assuming Bank**," in its entirety, provides as follows:

> Subject to Sections 2.5 and 4.8, [JPMorgan Chase] expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the liabilities of [WaMu] which are reflected on the Books and Records of [WaMu] as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"). Notwithstanding Section 4.8, [JPMorgan Chase] specifically assumes all mortgage servicing rights and obligations of [WaMu].

[JPMorgan Chase's Exhibit 1, ¶ 2.1] (emphasis added).

not purchased from the FDIC by JPMorgan Chase—because if this argument is correct, the issue of whether the Debtors' claims in the suit at bar constitute "borrower claims" that were expressly not assumed under the P&A Agreement is moot.

### 1. There is no conclusive evidence that Wells Fargo assumed all of WaMu's rights and obligations with respect to the servicing of the Penas' loan.

JPMorgan Chase has requested that this Court take judicial notice of the Audit, which, it contends, conclusively establishes that WaMu's rights and obligations with respect to the Penas' loan was transferred to Wells Fargo in December of 2006. Based on this purported fact, JPMorgan Chase asserts that any liability relating to the servicing of the Penas' loan belongs to Wells Fargo and were not among the rights and obligations transferred to JPMorgan Chase under the P&A Agreement.

This Court may take—and, here, does take—judicial notice of the Audit. *See, e.g., Wilson v. Huffman (In re Missionary Baptist Found. of Am.)*, 712 F.2d 206, 211 (5th Cir. 1983) ("A court may take judicial notice of the record in prior related proceedings, and draw reasonable inferences therefrom."); *Faulkner v. Kornman (In re Heritage Organization, L.L.C.)*, No. 06-3377-BJH, 2008 WL 5215688, at *26 n.25 (Bankr. N.D. Tex. Dec. 12, 2008) ("This Court may sua sponte take judicial notice of information in the docket . . . ."); *Frascogna v. Security Check, LLC*, No. 3:07cv686 DPJ-JCS, 2009 WL 57102, at *4 n.3 (S.D. Miss. Jan. 7, 2009) ("The Court may take judicial notice of its docket."). However, the Audit does not conclusively establish that WaMu relinquished all of its servicing obligations with respect to the Penas' loan to Wells Fargo.

The Audit merely relates that during the period beginning on December 1, 2006 and ending on June 27, 2007, "Wells Fargo continued to service the Penas' loan in lock step with [WaMu], that is to say, in a perpetual state of default because it failed to recalibrate the loan according to the Bankruptcy Rules and to properly establish the Trustee's suspense account." [Finding of Fact No.

13

11.] This Court cannot determine whether this language—i.e. that Wells Fargo serviced the Penas' loan "in lock step" with WaMu—conveys that Wells Fargo and WaMu serviced the Penas' loan jointly or whether Wells Fargo serviced the Penas' loan in the same manner as WaMu.[4] This Court needs more evidence before it can make a finding that Wells Fargo assumed all of WaMu's servicing obligations such that servicing of the Penas' loan was not among the liabilities transferred to JPMorgan Chase under the P&A Agreement. Indeed, the Debtors specifically complain that they do not know whether all, some, or none of WaMu's rights and obligations with respect to the Penas' loan were transferred to Wells Fargo. [Finding of Fact No. 17.] Because there is a genuine issue of material fact with respect to whether all of WaMu's servicing obligations were transferred to Wells Fargo, this Court must deny the Motion to Dismiss.

## 2. The Debtors may have claims against JPMorgan Chase, which has assumed "all mortgage servicing rights and obligations" of WaMu.

JPMorgan Chase also contends that, under the P&A Agreement, it expressly did not assume liability for any "borrower claims" against WaMu and that, therefore, the Debtors' claims against JPMorgan Chase must be dismissed. Essentially, JPMorgan Chase argues that the FDIC, as receiver of WaMu's assets and obligations, is the proper party to be sued. The Debtors argue: (1) that they have not brought "borrower claims" against JPMorgan Chase, but rather claims based on WaMu's improper servicing of their loan with Countrywide; and (2) that JPMorgan Chase expressly assumed liability for "all mortgage servicing rights and obligations" of WaMu.

JPMorgan Chase points to the following cases to support its contention that this Court should

---

[4] Additionally, even if the Audit plainly set forth that all of WaMu's servicing obligations with respect to the Penas' loan were transferred to Wells Fargo in December of 2006, the Audit is not evidence and, in fact, this Court is required to accept all of the Debtors' factual allegations as true for the purposes of ruling on the Motion to Dismiss. Here, the Debtors assert that the issue of Wells Fargo's assumption of WaMu's servicing liability is a genuine issue of fact that remains to be adjudicated. The fact that this Court takes judicial notice that the Audit was filed with the clerk's office and is therefore on the docket does not somehow eviscerate JPMorgan Chase's burden to produce evidence to support its position that there is no genuine issue of material fact with respect to whether all of WaMu's servicing obligations were transferred to Wells Fargo in December of 2006.

respect the allocation of liabilities set forth in the P&A Agreement: *West Park Assoc. v. Butterfield Sav. & Loan Ass'n*, 60 F.3d 1452, 1458 (9th Cir. 1995); *Vernon v. RTC*, 907 F.2d 1101, 1109 (11th Cir. 1990); *First Ind. Fed. Sav. Bank v. FDIC*, 964 F.2d 503, 506-07 (5th Cir. 1992); *Pernie Bailey Drilling Co. v. FDIC*, 905 F.2d 78, 80 (5th Cir. 1990); *Huntington Towers Ltd. v. Franklin Nat'l Bank*, 559 F.2d 863, 869 (2d Cir. 1977); *Payne v. Sec. Sav. & Loan Ass'n*, 924 F.2d 109, 111 (7th Cir. 1991); *Cassese v. Wash. Mut., Inc.*, No. 05 CV 2724 (ADS) (ARL), slip copy, (E.D.N.Y. Dec. 22, 2008). However, all but one of these cases are factually distinguishable from the suit at bar and none involve claims based solely on a failed bank's servicing obligations. The Court will discuss each case in turn.

In *West Park*, shareholders of the parent company of a failed bank sued the entity that purchased failed bank's assets from the FSLIC[5] for the failed bank's various violations of Oregon's Blue Sky Law. *West Park Assoc.*, 60 F.3d at 1454. Because the purchase and assumption agreement between the purchasing entity and the FSLIC expressly exempted from the transfer the failed bank's liabilities to its shareholders, the court determined that the FDIC (which later succeeded the FSLIC as receiver), and not the purchasing entity, was the proper party to the suit. *Id.* at 1458. Specifically, the purchase and assumption agreement in *West Park* provided that the purchasing entity would assume all of the failed bank's assets and liabilities except for any "obligation[s] of [the failed bank] to its stockholders for or in connection with their stock holdings." *Id.* Based on this clear language, the Ninth Circuit determined that any claims that were brought by the shareholders in connection with their ownership of stock in the failed bank were excepted from the transfer and must be brought against the FDIC. *Id.*

---

[5] The Federal Savings and Loan Insurance Corporation (FSLIC) was established to insure deposits in savings and loan institutions as part of the National Housing Act of 1934. Ironically, the FSLIC became insolvent during the 1980s savings and loan crisis. As a result, the FSLIC was abolished in 1989 by the Financial Institutions Reform, Recovery and Enforcement Act, and its responsibilities for deposit insurance were transferred to the FDIC.

The facts of *Vernon* are substantially similar to those of *West Park*. In *Vernon*, the shareholders of a failed bank sued the entity that purchased the failed bank's assets and obligations from the FSLIC. *Vernon*, 907 F.2d at 1109. The Eleventh Circuit determined that the acquisition agreement between the purchasing entity and the FSLIC excepted from the transfer all liabilities of the failed bank to its stockholders. *Id.* As a result, the Eleventh Circuit held that the district court properly dismissed the stockholders' claims. *Id.*

In the suit at bar, although the P&A Agreement provides that JPMorgan Chase will not be liable for any "borrower claims," it expressly provides that JPMorgan Chase will assume all of WaMu's "mortgage servicing . . . obligations." Thus—unlike the facts in *West Park* and *Vernon*—it is not clear whether JPMorgan Chase and the FDIC intended to except from the transfer WaMu's liabilities pursuant to its servicing contracts with other lenders. It is important to note that because WaMu transferred its loan with the Penas' to Countrywide, the Penas are no longer "borrowers" with respect to WaMu. Thus, it is unclear whether the claims asserted by the Debtors in the case at bar are "borrower claims."

In *First Indiana*, the Fifth Circuit determined that pursuant to the plain language of an acquisition agreement transferring a failed bank's assets and liabilities from the FSLIC to a purchasing entity, the purchasing entity only assumed the failed bank's liabilities that were secured by the failed bank's assets. *First Ind. Fed. Sav. Bank*, 964 F.2d at 506-07. Specifically, the acquisition agreement in *First Indiana* provided that the purchasing entity would assume only "liabilities that are secured by assets" of the failed bank, and expressly provided that the purchasing entity would *not* assume any other liabilities or obligations of the failed bank. *Id.* at 506. Based on this language, the Fifth Circuit determined that the plaintiff's breach of contract claims were not "liabilities that are secured by assets purchased" by the purchasing entity, but rather were unsecured

liabilities that were expressly excepted from the transfer.[6] *Id.*

*First Indiana* is materially distinguishable from the suit at bar. First, as discussed above, the P&A Agreement only excepted liabilities for "borrower claims" from the transfer to JPMorgan Chase, not—as in *First Indiana*—all unsecured liabilities. Second, the P&A Agreement expressly sets forth that JPMorgan Chase would assume *all* of WaMu's liabilities except for liabilities for "borrower claims," *see supra* note 3; whereas, in *First Indiana*, the agreement provided that the purchasing entity would assume *none* of the failed bank's liabilities except for those that "are secured by the assets purchased." *Id.*

In *Pernie Bailey Drilling*, a plaintiff brought suit against the purchaser of a failed bank's assets in Texas state court. *Pernie Bailey Drilling Co.*, 905 F.2d at 79. When the FDIC intervened and removed the action to federal court, the plaintiff appealed. The Fifth Circuit determined that the FDIC was a proper party to the action because the FDIC agreed to indemnify the purchaser under the terms of its purchase and assumption agreement. *Id.* at 80.

Unlike the suit in *Pernie Bailey Drilling*, the dispute at bar does not involve whether the FDIC is a proper party to this adversary proceeding, but rather whether the Debtors' claims may properly be asserted against JPMorgan Chase, as purchaser of WaMu's assets and obligations.

---

[6] The Fifth Circuit also raised an issue in *First Indiana* that highlights the importance of determining the rights and obligations of an entity that purchases a failed bank's assets from the FDIC. The Fifth Circuit noted that because the plaintiff's "only recourse was to seek relief against the FDIC as receiver for [the failed bank]," the plaintiff would ultimately be left high and dry because the failed bank was insolvent and the FDIC—in receivership suits—stands in the shoes of the failed bank. The Fifth Circuit determined that "[c]ongressional policy requires that creditors of failed institutions look only to the assets of the institution for recovery of their losses" and explained that even "[i]f First Indiana were to obtain a judgment in its favor, that judgment could not exceed the amount it would have received in a liquidation—in this case, nothing." *Id.* at 507. The court even went so far as to say, in dicta, that such a plaintiff's claims are essentially moot and should be dismissed for prudential reasons because, irrespective of the validity of a plaintiff's claim, "there are no set of circumstances under which [the plaintiff] can recover any money or property as a result of those claims." *Id.* This means that plaintiffs—like the Debtors in the suit at bar—with potentially meritorious causes of action against a failed bank will often be left without recourse if the purchasing entity did not assume the failed bank's liabilities and the plaintiff is required to sue the FDIC. This reasoning provides a strong incentive for courts to carefully scrutinize the language of purchase and assumption agreements executed between the FDIC and a purchaser of a failed bank's assets and obligations. Courts that are quick to conclude that the purchasing entity did not assume any liabilities will likely be leaving plaintiffs who may have been wronged without a remedy.

Notably, there was no dispute in *Pernie Bailey Drilling* as to whether the *purchaser* was properly joined. The issue in that lawsuit was solely whether the FDIC, in its capacity as receiver for the failed bank, properly intervened in a lawsuit brought against the purchaser of the failed bank's assets. Certainly, the FDIC is entitled to intervene and may properly be joined in the lawsuit at bar. However, the issue of whether the FDIC is a proper party to this lawsuit is wholly separate and distinct from the issue of whether JPMorgan Chase should be dismissed.

In *Huntington Towers*, borrowers of a failed bank sued the failed bank, another bank that had purchased most of the failed bank's assets, the Federal Reserve Bank of New York, the FDIC, and the Comptroller of the Currency on the grounds that the entire receivership and purchase and assumption transaction constituted a fraud on the creditors of the failed bank. *Huntington Towers Ltd.*, 559 F.2d at 865-66. The conduct that gave rise to the dispute in *Huntington Towers* stemmed from the Federal Reserve Bank's emergency extension of credit to the failed bank, after which the FDIC assumed, and thereafter sold, most of the failed bank's assets while simultaneously agreeing to pay all of the failed bank's debt to the Federal Reserve Bank. *Id.* at 865. The plaintiff—one of the failed bank's borrowers—sued the Federal Reserve Bank under a fraudulent transfer theory because it took a lien on all of the failed bank's assets when extending emergency credit. *Id.* at 867. The Second Circuit upheld the district court's ruling that the Federal Reserve Bank was not a proper party to the lawsuit because, pursuant to the purchase and assumption agreement, it had expressly released its lien to the FDIC. *Id.* at 869. Thus, the Second Circuit affirmed that the FDIC, and not the Federal Reserve Bank, was the proper party to sue under a fraudulent transfer theory.

As discussed above, the suit at bar involves a purchasing entity (JPMorgan Chase) that has acquired "all mortgage servicing rights and obligations" of a failed bank (WaMu) from the FDIC. [Finding of Fact No. 17.] This lawsuit does not involve—as did the lawsuit in *Huntington*

*Towers*—a party that provided emergency credit and took a lien on the failed bank's assets, which was thereafter released to the FDIC. The asset giving rise to the lawsuit in *Huntington Towers*—i.e. the lien on the failed bank's assets—clearly belonged to the FDIC-receiver; whereas the asset that forms the basis for the dispute at bar—i.e. WaMu's servicing contract with Countrywide—has been transferred to JPMorgan Chase. Thus, the facts of this lawsuit are materially distinguishable from *Huntington Towers* because, here, there is a genuine issue as to whether the servicing obligations that form the basis for this suit belong to JPMorgan Chase.

In *Payne*, a plaintiff attempted to join the purchaser of a failed bank's assets in his age discrimination suit against the failed bank. *Payne*, 924 F.2d at 111. Because the purchaser had only assumed specific liabilities enumerated in its purchase and assumption agreement with the failed bank's receiver and because "[l]itigation liabilities were not mentioned in the agreement," the Seventh Circuit determined that the receiver was the proper successor to the failed bank's liability to former employees. *Id.*

Once again, JPMorgan Chase points to a case where the purchaser clearly disclaimed liability for the plaintiff's lawsuit under its purchase and assumption agreement with the failed bank's receiver. That is not the case in the dispute at bar. Whether JPMorgan Chase intended to disclaim *all* litigation liabilities when it excepted "borrower claims" from the transfer is not clear from the plain language of the P&A Agreement, especially given the fact that JPMorgan Chase has expressly assumed all of WaMu's servicing obligations.   [Finding of Fact No. 17.]

The one case cited by JPMorgan Chase that is similar to the case at bar is the unpublished opinion of the District Court for the Eastern District of New York in *Cassese v. Washington Mutual, Inc.*, No 05 CV 2724 (ADS) (ARL), slip copy, (E.D.N.Y. Dec. 22, 2008). In *Cassese*, a class of plaintiffs sued JPMorgan Chase based on the theory that, as purchaser of WaMu's assets and

obligations pursuant to the P&A Agreement, JPMorgan Chase was liable for "impos[ing] and collect[ing] unlawful fees, prepayment penalties, and finance charges from them in connection with their mortgage loans." *Cassese*, No. 05 CV 2724 (ADS) (ARL), at *2. The court noted the language in the P&A Agreement pertaining to "borrower claims"—which is identical to the language at issue in the suit at bar—and determined, citing to the *Payne* case discussed above, that "JPMorgan Chase expressly disclaimed assumption of liability arising from borrower claims, . . . including those at issue in this action." *Id.* at *6 (citing *Payne*, 924 F.2d at 111).

Despite the factual similarities in *Cassese*, nothing in that case  indicates whether the class of plaintiffs suing JPMorgan Chase had loans with WaMu or whether WaMu was simply servicing these plaintiffs' loans for another bank. This Court surmises that the former was the case because the court in *Cassese* specifically relied on section 2.5 of the P&A Agreement (the section disclaiming liability for "borrower claims") for its holding. *Id.* Indeed, when quoting section 2.1 of the P&A Agreement, the *Cassese* court omitted the language at issue in the suit at bar which provides that JPMorgan Chase "specifically assumes all mortgage servicing rights and obligations" of WaMu. *Id.* If—as in the suit at bar—the plaintiffs in *Cassese* had sued JPMorgan Chase based on WaMu's activities as servicer of a loan held by another bank, that court would have assuredly addressed the contradictory language in the P&A Agreement what provides that JPMorgan Chase will assume all of WaMu's servicing obligations.  This Court agrees that if WaMu had not sold the Penas' loan to Countrywide, then the Debtors' claims against WaMu would have fallen under the category of "borrower claims," but the record presently reflects that the Penas are no longer borrowers with respect to WaMu.  [Finding of Fact No. 17.]  In any event, even if the *Cassese* court had concluded that P&A Agreement's disclaimer of "borrower claims" encompassed all liabilities associated with WaMu's servicing contracts with other banks, the unpublished decision of the District Court for the

20

Eastern District of New York is not binding on this Court.

The cases cited by JPMorgan Chase discussed above are distinguishable from the suit at bar. In all of these cases, the allocation of liabilities under the purchase and assumption agreement was clear. Here, the P&A Agreement's allocation of WaMu's liabilities cannot be determined based upon a simple reading of the agreement. Indeed, the P&A Agreement appears to allocate WaMu's *lender liability* to the FDIC and to transfer WaMu's *servicing liability* to JPMorgan Chase. *See* [Finding of Fact No. 17.] Thus—if WaMu's servicing of the Penas' loan was not transferred to Wells Fargo—two key issues remain to be resolved before this Court may consider whether JPMorgan Chase is a proper party to this lawsuit: (a) whether the parties to the P&A Agreement intended to include claims based on WaMu's alleged improper servicing of another bank's loan under the term "borrower claims"; and (b) whether JPMorgan Chase's express assumption of WaMu's mortgage servicing obligations constitutes an assumption of liability for WaMu's alleged failure to properly service the Penas' loan.

In sum, there is nothing in the record to conclusively establish that the Debtor's claims were improperly asserted against JPMorgan Chase. Therefore, the question of which of WaMu's liabilities were assumed by JPMorgan Chase and which were retained by the FDIC is a genuine issue of material fact that cannot be resolved based on a plain reading of the P&A Agreement. Accordingly, the Motion to Dismiss—when construed as a motion for summary judgment, *see supra* Part III.C—should be denied.

## IV. CONCLUSION

For the reasons set forth above, this Court concludes that the Motion to Dismiss should be denied. An order consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry of this Memorandum Opinion.

Signed on this 5th day of August, 2009.

                                        _____

                                        Jeff Bohm
                                        United States Bankruptcy Judge